ELIZABETH S. VALE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 53041. Promulgated July 31, 1934.

*Henry Brach, C.P.A., Alfred Ely, Esq.,* and *N. Norman Mayer, Esq.,* for the petitioner.

*Nathan Gammon, Esq.,* and *W. W. Kerr, Esq.,* for the respondent.

#### OPINION.

TRAMMELL: This proceeding is for the redetermination of deficiencies in income tax of $6,888.36, $539.72, and $296.73 for 1925, 1926, and 1927, respectively. The matters put in controversy by the petition as amended are the correctness of the respondent's action (1) in using the March 1, 1913, value in determining the amount of a loss sustained in 1925 on the sale of bonds of Manitou & Pikes Peak Railway Co.; (2) in refusing to allow as deductions for 1925 as losses the amounts of $5,234.50 and $4,478.41 alleged to have been

sustained on the sale of shares of stock and of notes, respectively, of Simmons Sugar, Ltd.; and (3) in determining the cost to petitioner of certain shares of stock in the Simmons Co. sold during 1925, 1926, and 1927. In an amended answer the respondent alleged that in computing the loss on the sale in 1925 of the bonds of Manitou & Pikes Peak Railway Co. he erred in not using the value of such bonds on February 11, 1920, instead of the value on March 1, 1913. He also alleged that in determining the deficiency for 1925 he erred in allowing a capital loss in the amount of $33,847.10 on the sale in that year of 814 shares of stock in the Manitou & Pikes Peak Railway Co., instead of a capital loss in the amount of $3,663 as a result of his using the March 1, 1913, value of such stock instead of its value on February 11, 1920. He also asked that the deficiency for 1925 be increased accordingly.

The petitioner is a resident of Princeton, New Jersey. Her name prior to her marriage to Harry M. Vale, which took place subsequent to January 29, 1903, was Elizabeth C. Simmons. She is a granddaughter of Z. G. Simmons, deceased, of Kenosha, Wisconsin, who died testate on February 11, 1910, leaving a will made January 29, 1903. The will was duly probated after his death. The petitioner was one of the residuary beneficiaries of the trust created by the will.

Pertinent provisions of the will are as follows:

SECOND:

After the payment of my just debts and funeral expenses and the charges and expenses of settling and administering my estate, I hereby give, devise and bequeath all and singular the rest, residue and remainder of my estate of every name, nature and description, and both real and personal and mixed and wherever situate, unto my EXECUTOR and TRUSTEE hereinafter named, IN TRUST, however, upon the following terms and conditions and for the following uses and purposes, viz:

1: To hold, manage, prosecute, conduct and carry on with my estate and property, either all or any of the lines of business in which I shall or may be engaged at the time of my decease, for a period of ten years from and after my decease, and I hereby authorize and empower my said EXECUTOR and TRUSTEE to hold, manage, prosecute, conduct and carry on the said lines of business as fully in all respects as I could or might do were I living, * * *

2: From the net income and profits of my said estate, business and property, and in case of the failure of income and profits from my said estate, then out of the principal thereof to pay to my sister Esther Stebbins of the City of Kenosha, Wisconsin, the sum of Thirty (30) Dollars per week, payable weekly, for and during the term of the natural life of my said sister Esther Stebbins.

And to pay to MISS CHARITY ROBESON, the sister of my deceased wife, the sum of Forty (40) Dollars per month, payable monthly, for and during the term and period of the natural life of the said MISS CHARITY ROBESON. And in the event of the division and distribution of my estate as hereinafter provided before the death of my said sister and the said sister of my deceased wife, then and in such case the payment of the sums aforesaid to my said sister and

to the said sister of my deceased wife shall be a lien and charge upon each of the shares of my said estate in the hands of my son and daughters and grand-daughter hereinafter named, their heirs or assigns respectively, and shall be paid by them at the times and in the manner hereinbefore provided, in proportion to their respective shares in my estate.

3: To divide, in the discretion of my said EXECUTOR and TRUSTEE, and at such time or times as he may deem proper during said period, the whole or any part of the surplus income and profits, if any, of my said property and estate, after the payment of the said sums to my said sister and to the said sister of my deceased wife, hereinbefore provided for, one-sixth to my grand-daughter ELIZABETH C. SIMMONS and the balance and remainder equally between my son Z. G. SIMMONS, JR., and my daughter MINNIE S. TOWNE and my daughter BELLE S. LANCE, share and share alike, one-third to each.

4: It is my will and desire and I hereby direct that at the end of said period of ten years after my decease, my said EXECUTOR and TRUSTEE shall pay or deliver to my said grand-daughter ELIZABETH C. SIMMONS one-sixth of my estate and property then remaining and shall then divide all and singular the rest, residue and remainder of my estate and the increment thereof into three equal shares or portions, and that one such share or portion be paid and conveyed to my said son Z. G. SIMMONS, JR. and one such share or portion to my said daughter MINNIE S. TOWNE and one such share or portion to my said daughter BELLE S. LANCE, or their respective heirs, executors or administrators; PROVIDED, HOWEVER, that if at any time before the expiration of said period of ten years my said son Z. G. SIMMONS, JR. and my said daughters MINNIE S. TOWNE and BELLE S. LANCE, or their respective heirs, executors or administrators, shall all agree in writing to divide said estate, that then and in that case my said executor and trustee shall forthwith and as soon as practicable without loss to my said estate, pay or deliver to my said grand-daughter ELIZABETH C. SIMMONS one-sixth of my estate and property then remaining, and shall then divide the rest, residue and remainder of my estate and property into three equal portions and pay and convey one such share or portion to my said son Z. G. SIMMONS, JR.: one such share or portion to my said daughter MINNIE S. TOWNE, and one such share or portion to my said daughter BELLE S. LANCE, or to their respective heirs or legal representatives; PROVIDED, HOWEVER, that nothing herein contained shall prevent my said son and daughters from continuing said Trust beyond said period of ten years if a majority of them, or the survivors of them, shall elect in writing so to do; but in any event the one-sixth share of my said grand-daughter shall be paid or delivered to her at the end of said period of ten years.

In July 1921 petitioner, the daughters, and the son of the decedent, all being beneficiaries under the will of Z. G. Simmons, deceased, hereinafter referred to as the decedent, entered into the following agreement respecting a continuation of the trust for an additional period of 10 years:

WHEREAS, the last will and testament of Zalmon G. Simmons, deceased, provides for a trusteeship of his estate for a period of ten (10) years from the date of his death, and further provides that said trust may be continued beyond said period of ten (10) years by the written application of a majority of his heirs, or the survivors of them; and

WHEREAS, the said Zalmon G. Simmons, deceased, died at Kenosha, Wisconsin, on the 11th day of February, A.D. 1910:

Now, Therefore, It Is Hereby Agreed that the trusteeship created under said last will and testament be, and the same is hereby, continued for a period of ten (10) years from and after the 11th day of February, A.D. 1920.

### Stock and Bonds of Manitou & Pikes Peak Railway Co.

At the time of his death on February 11, 1910, the decedent was the owner of certain shares of stock and bonds of the Manitou and Pikes Peak Railway Co. On or subsequent to February 11, 1920, the petitioner received as a part of the distribution made out of the trust created by the will of the decedent 814 shares of stock in that company and 70 of its bonds, such bonds having a face or par value of $1,000 each. The value of these securities on the dates indicated was as follows:

|  | Feb. 11, 1910 | March 1, 1913 | Feb. 11, 1920 |
|---|---|---|---|
| 814 shares of stock | $32,560.00 | $34,254.10 | $4,070.00 |
| 70 bonds | 70,000.00 | 65,076.83 | 35,000.00 |

During 1925 the petitioner sold these securities, receiving $407 for the stock and $16,331.46 for the bonds. In her income tax return for that year she reported the transaction as follows:

|  | Stock | Bonds |
|---|---|---|
| March 1, 1913 value | $34,254.10 | $65,076.83 |
| Selling price | 407.00 | 16,331.46 |
| Loss | 33,847.10 | 48,745.37 |

In determining the deficiency for 1925 the respondent accepted the loss on the sale as returned by the petitioner, except that he treated it as a capital loss, whereas in her return the petitioner had deducted the amount of the loss from other income.

In an amended answer filed in September 1933 the respondent contended that the loss on the sale of the stock and bonds should be computed as follows:

|  | Stock | Bonds |
|---|---|---|
| Value February 11, 1920 | $4,070.00 | $35,000.00 |
| Selling price | 407.00 | 16,331.46 |
| Capital loss | 3,663.00 | 18,668.54 |

The petitioner contends that the cost basis for computing the loss on the transaction is the value of the securities at the date of death of the decedent, February 11, 1910, or their value on March 1, 1913, whichever is greater; that the loss on the stock is $33,847.10 as re-

ported in her return; and that the loss on the bonds is $53,669.54 or an amount $4,924.17 in excess of that reported in her return. This excess results from the use of the value on February 11, 1910, which was greater than the value on March 1, 1913, which was used in the return.

In a stipulation of facts filed by the parties at the hearing the position of the respondent with respect to the computation of the amount of the capital loss on the sale of the stock and bonds is stated to be that advanced in his amended answer filed in September 1933, that is, by using as a cost basis the value of the securities on February 11, 1920. His position is further stated in the stipulation to be that "in any event, the petitioner did not acquire, at the death of Z. G. Simmons on February 11, 1910, anything more than a future beneficial one-sixth interest in the residuary estate of Z. G. Simmons remaining after the payment by the trust created by the will of said Z. G. Simmons of the legacies bequeathed to Esther Stebbins and to Charity Robeson as provided for in paragraph numbered 2 of the aforesaid will, and after the distribution of certain surplus income and profits during the period of said trust to various legatees as provided for in paragraph numbered 3 of the aforesaid will; and that, in determining petitioner's capital gain or capital loss upon the sale of said stock and bonds, the cost basis thereof should be the value of said future beneficial one-sixth interest in the residuary estate of Z. G. Simmons rather than the value of said stock and bonds of Manitou & Pikes Peak Ry. Co. on February 11, 1910 (or March 1, 1913)." At the hearing counsel for the respondent, after referring to decisions on the point and to a study of the statutes of Wisconsin, stated that the respondent was not now contending that the value on February 11, 1920, as advanced in the amended answer filed in September 1933, was the proper cost basis to be used, but the value of such securities at the time of the decedent's death or on March 1, 1913, subject, however, to the charge upon them resulting from the provisions of the will for the payment of the amounts weekly and monthly to Esther Stebbins and Charity Robeson, respectively. This is the position taken by him in his brief.

In view of the foregoing there appears to be no controversy between the parties with respect to whatever rights the petitioner acquired under the will of the decedent having vested in petitioner upon the death of the decedent in 1910. The controversy is as to whether in determining the amount of the loss on the stock and bonds the full value on February 11, 1910, or the full value on March 1, 1913, whichever is greater, is to be used, or whether such value is to be reduced on account of the payments to be made under the will to the legatees.

In *William Huggett*, 24 B.T.A. 669, a grandmother of the taxpayer's wife died testate in 1912, giving her daughter a life interest in half the income from certain securities, with a part of the remainder over to the taxpayer's wife. In 1925 and in 1926 the taxpayer's wife sold stock which had been distributed to her as a remainderman. We there held that the basis for determining gain or loss was the value of the remainderman's interest on the basic date as distinguished from the value of the stock itself on that date. On appeal in *Huggett* v. *Burnet*, 64 Fed. (2d) 705, our holding in this respect was held to be erroneous. With all due respect to the court, we think our decision is sound and should be followed by us in cases arising from the jurisdiction of other courts of review, at least until some of such courts have spoken in the matter. In our opinion the fair market value on a particular date of a share of stock or a bond, the possession of which and the complete enjoyment of the income from which are postponed or deferred until some later date or period, is not as great as a share of the same kind of stock or the same kind of a bond not subject to such restriction. Especially is this true in the instant case, where not only was the possession by the petitioner of the securities in question deferred for a period of 10 years, but such securities were charged proportionately with the payment of certain amounts weekly and monthly for indefinite periods, namely, during the lives of Esther Stebbins and Charity Robeson, respectively.

With the exception that Esther Stebbins was about 75 years of age at the time of the death of the decedent, that she died in 1919 or 1920, and that at some time after 1920 the petitioner made provision for taking care of the payments to Charity Robeson, we know nothing as to the value on February 11, 1910, or on any other date of the legacy payments that were to be made to these parties. Nor are we informed as to the portion of the petitioner's proportional part of the value of the legacy payments on February 10, 1911, or on March 1, 1913, that is applicable to the shares of stock and bonds here under consideration. While counsel for the petitioner discusses in his brief the amount of the adjustment to be made to the value of the stock and bonds on the basic dates on account of the legacies and reaches the conclusion that such adjustment would be less than one percent of the value of the securities on such dates, his conclusion is based in part upon mere assumptions unsupported by the record.

Since the rule laid down by us in the *Huggett* case is applicable here and as the evidence submitted by petitioner is not complete enough to enable us to make any change in the amount of the losses on the sale of the stock and the bonds as reported by the petitioner in her return for 1925 and as accepted by the respondent in making

his determination, the contention of the petitioner as to an increase in the amount of the allowance for a loss on the bonds must be denied. In view of the foregoing as well as the present position of the respondent with respect to the use of the value on February 11, 1920, in determining the amount of the loss on the stock and the bonds his request for an increase in the amount of the deficiency must be denied.

*Stock and Notes of Simmons Sugar, Ltd.*

At the time of his death the decedent owned 205 shares of the capital stock of the Simmons Sugar Co. Subsequent to the death of the decedent one Roberts made a claim against the estate for 25½ shares of the stock under an option that he held. The claim was allowed, leaving 179½ shares of the stock still owned by the estate. The company had been formed in 1908 or 1909 to prosecute the development of a new process, hereinafter referred to as the Simmons process, for the extraction of sugar from sugar cane. Prior to July 1911 it was found that a part of the process would not work as speedily as had been anticipated. However, this was considered only a minor disappointment.

In January 1910 one tenth or 100 shares of the outstanding stock of the Simmons Sugar Co. were purchased from the decedent and one McMullen by the United Fruit Co. at $2,500 per share. In 1910, subsequent to the death of the decedent, his son and McMullen purchased four shares of stock in the company at $2,500 per share. These two parties also in 1910 purchased a 90-day option at $250 a share to buy 100 shares of stock in the company at $2,500 a share. This option was extended for some undisclosed period, but was not exercised. About the same time two other options were given for the purchase of the stock at $2,500 per share. One option was for 30 shares and the other was for 8 shares. The consideration paid for these options, the period for which they extended, and whether they were ever exercised, is not disclosed.

About July 1, 1911, Simmons Sugar, Ltd., was formed and thereafter the 179½ shares of stock owned by the estate of the decedent in the Simmons Sugar Co. were exchanged solely for 1,795 shares of stock in the newly formed organization. Thereafter the estate received 449 shares of stock in Simmons Sugar, Ltd., apparently as a bonus with the purchase of certain gold notes, to be referred to immediately. In 1911, in order to obtain funds for development and other purposes, Simmons Sugar, Ltd., offered its gold notes for sale to its stockholders in proportion to their stockholdings. In that year the estate of the decedent purchased between $45,000 and $46,000 face value of the notes for a like amount of cash. Having exhausted its own funds in attempting to develop the Simmons process, Sim-

mons Sugar, Ltd., in 1912 entered into an agreement with the United Fruit Co., pursuant to which that company furnished such money as was spent thereafter. Under the agreement the United Fruit Co. was to obtain an interest in the patents of Simmons Sugar, Ltd., because of expenditures which it might make in developing those patents. Efforts to perfect the Simmons process were continued until 1922 when, after the expenditure of approximately $500,000 between 1910 and that year, it was abandoned because it had been found to be unsuccessful.

In 1922, when the Simmons process was abandoned, the only other asset that Simmons Sugar, Ltd., had was an application for a patent known as the Trindler application, which was for a process to make decolorization of carbon. The application had been filed on June 11, 1920, in the name of one Trindler and had thereafter on some undisclosed date been assigned to Simmons Sugar, Ltd. On June 18, 1920, one Chandler filed an application for a patent on the same or a similar process. Interference proceedings were begun by Chandler on February 27, 1925. Chandler took testimony respecting his application and proved that he had introduced the process into this country prior to the filing date of Trindler's application. No testimony was taken with respect to the Trindler application. On some undisclosed date in 1926 the Trindler application was rejected by the Patent Office. Bills of an attorney for his services in prosecuting the Trindler application before the Patent Office were rendered to Simmons Sugar, Ltd., in 1924, 1925, and 1926, but were paid by the United Fruit Co.

On November 30, 1925, the petitioner received in distribution from the trust estate as created by the decedent's will and as extended by the agreement in July 1921, 374 shares of stock in Simmons Sugar, Ltd., and $7,616.72 face value of its gold notes. The securities thus distributed to the petitioner represented her one-sixth interest in the total of such securities then held by the estate.

While the record does not disclose exactly what amount or amounts the petitioner deducted in her 1925 return as losses on the stock and notes of Simmons Sugar, Ltd., the deficiency notice discloses that the respondent disallowed a loss of $5,234.50 with respect to the shares of stock and $4,478.41 with respect to the notes, such amounts apparently having been taken as deductions for losses sustained on the sale of the securities.

The petitioner contends that these securities were sold on December 31, 1925, for 75 cents; that she sustained a deductible loss on account of such sale; that the cost basis for determining the amount of her loss is $74,625 for the 374 shares of stock (⅙ of the total value of 179½ shares of stock in the Simmons Sugar Co. at $2,500 per share, the value urged at July 1, 1911); and that the cost basis

for determining the amount of the loss on the notes is $7,616.72 (the amount paid therefor by the trustee in 1911). The petitioner further contends that, if a deduction is not allowed in 1925 as a loss sustained on the sale of the securities in that year, she is entitled to a deduction in 1926 as a loss sustained as a result of the securities having become worthless in that year. The respondent denies that a bona fide sale of the securities was made in 1925 and further denies that they became worthless in 1926. He contends that the value of the securities when acquired or on March 1, 1913, has not been shown, and, further, that there is no showing that the securities had not become worthless by December 31, 1924.

In order to establish the sale of the 374 shares of stock and the $7,616.72 face value of the notes for 75 cents on December 31, 1925, counsel for the petitioner offered in evidence at the hearing certain written, ex parte, and unsworn statements of deceased persons alleged to have been participants in the transaction. Some of the statements counsel attempted to identify by purely hearsay testimony. Certain other written but inconclusive data, such as canceled checks, sheets from brokers' records, etc., which were dependent for their probative value upon the statements just referred to, were also offered. Objection to the admission of the statements and other data was made by counsel for the respondent and ruling was reserved. The testimony of the petitioner with respect to the transaction was not offered, notwithstanding the fact that it was available, at least by deposition. Upon consideration of the statements and other data offered in evidence by petitioner's counsel we hold that they are not admissible. At most all that they purport to show is that the securities were sold by one Ahrens, who was an agent of the petitioner and who is now deceased, to one Bruck, who is also deceased, for a consideration of 75 cents. They disclose nothing as to whether the purported transaction was one at arm's length, nor do they disclose anything as to any other matter relating to its genuineness. A purported sale of notes of a face value of $7,616.72 for 75 cents presents a serious question as to its genuineness, but when it is considered that a consideration of only 75 cents was paid for notes of a face value of $7,616.72 and 374 shares of stock, the question of genuineness becomes more serious. Especially is this true when it is considered that the stamp transfer tax payable by the petitioner on a sale of 374 shares of stock was practically 10 times the consideration alleged to have been received for both the notes and the stock. This would be more consistent with the idea of a gift than a genuine sale. Under the foregoing circumstances we think it is particularly significant that the testimony of the petition as to the alleged sale was withheld and the statements and data referred to above were offered. There being no evidence in the record as to a sale of the

stock and the notes having been made in 1925, the petitioner's contention as to the allowance of a loss on a sale thereof must be denied.

In support of the contention that the stock and notes became worthless in 1926 the petitioner relies on the fact that the application for a patent, which was the only asset owned by Simmons Sugar, Ltd., was denied in that year. The record shows that this was the only asset that that company had owned since some time in 1922. Aside from the statement of an attorney, who was handling the application before the Patent Office, that the application was not a frivolous one, we know nothing as to its merits or its value in 1925 or any other year prior to 1926. We know, however, that when interference proceedings were pending in 1925 those in charge of handling the application took no testimony to sustain it as against another who was contesting it while the party who was contesting it prevailed on the ground of the testimony he took. There is nothing in the record to indicate that if a patent had been granted Simmons Sugar, Ltd., it would have had any substantial practical or market value.

Aside from the amount of the notes of Simmons Sugar, Ltd., held by the decedent's estate, which had been acquired in 1911, we are not informed as to the amount of that company's notes that were outstanding in 1922 or in any other year. We are not informed as to when they were due, or whether anything had ever been paid on them either as principal or as interest. We know nothing as to the amount of any other outstanding indebtedness of that company in 1922 or at any other time. So far as the record shows it may well have been in 1922 that the amount of the secured indebtedness of the company was many times the value of the application for a patent and that it was definitely ascertainable in that year that not only the notes of the company but also its stock was worthless. The mere fact that the application for a patent was rejected in 1926 does not standing alone establish that the stock and notes became worthless in that year. Inasmuch as the record fails to furnish a basis for determining in what year the stock and notes became worthless the contention of the petitioner that they became worthless in 1926 must be denied.

Being unable to find that there was a sale of the stock and notes in 1925 or that they became worthless in 1926, it becomes unnecessary to determine what their cost basis for determining loss was to the petitioner.

### Simmons Co. Stock.

The parties have stipulated as follows with respect to shares of stock in the Simmons Co. which were sold by the petitioner in 1925, 1926, and 1927:

The cost of 3,000 shares of common stock of Simmons Company sold by petitioner in 1925 for $109,180.00 is stipulated to be $13.53898 per share or $40,616.94 instead of $42,000.00 as reported in Schedule D of petitioner's income tax return for 1925 and instead of $33,457.47 as determined by the Commissioner * * * and the capital net gain or loss upon the sale of said stock is to be computed on the basis of such stipulated cost.

The cost of 1,000 shares of common stock of Simmons Company sold by petitioner in 1926 for $49,875.00 is stipulated to be $13.53898 per share or $13,538.98, instead of $15,220.00 as reported in Schedule D of petitioner's income tax return for 1926 and instead of $11,152.49 as determined by the respondent * * * and the capital net gain or loss upon the sale of said stock is to be computed on the basis of such stipulated cost.

The cost of 500 shares of common stock of Simmons Company sold by petitioner in 1927 for $24,405.00 is stipulated to be $13.53898 per share or $6,769.49, instead of $7,910.00 as reported in Schedule D of petitioner's income tax return for 1927 and instead of $5,576.25 as determined by the Commissioner * * * and the capital net gain or loss upon the sale of said stock is to be computed on the basis of such stipulated cost.

In a redetermination of the deficiencies for the respective years effect will be given to the foregoing stipulation of the parties.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

BLACK, dissenting: I dissent from the conclusion reached by the majority on the first point.

I believe we were in error in the rule which we laid down in *William Huggett*, 24 B.T.A. 669, and that case should no longer be followed. I think the Court of Appeals of the District of Columbia, in *Huggett* v. *Commissioner*, 64 Fed. (2d) 705, was right wherein it held in substance that the basis of property acquired by a remainder interest under a will, upon the death of the life tenant, is the value of the property at the date of the death of the testator or where death of the testator occurred prior to March 1, 1913, the value on that date may be used; and that the Board of Tax Appeals was in error in holding that the value of the property on March 1, 1913, should be reduced by the value of the estate of the life tenant.

It may be stated also in support of this view that the Board, in *Farley Hopkins*, 27 B.T.A. 845, and in *Isabel Richardson Molter*, 27 B.T.A. 442, held that under the provisions of the testator's will the taxpayer received a vested remainder interest and that the date of *acquisition* of the property sold in the tax years was the date of the death of the testator and that the basis for gain or loss was the *value of the property* at the time of the testator's death.

We said nothing in either case about reducing the value of the property by the life estate which was imposed upon it. Apparently that issue was not raised in either case. We followed the same rule laid

down in *Rodman E. Griscom*, 22 B.T.A. 979. Our decisions in both of these latter cases have been affirmed and in affirming us in *Hopkins* v. *Commissioner*, 69 Fed. (2d) 11, the court cited with approval the opinion of the Court of Appeals of the District of Columbia in *Huggett* v. *Commissioner*, *supra*, reversing the Board.

So in view of these facts I think the weight of authority is that, in such facts as we have in the instant case, the basis for gain or loss is the value of stock at the time of the testator's death, and if this event occurred prior to March 1, 1913, and the value at the time of the testator's death is greater than the value on March 1, 1913, then the former figure becomes the basis for figuring gain or loss on a sale. Such seems to be the contention of the petitioner in the instant case as to the bonds of the Manitou & Pikes Peak Railway Co. They were of greater value at the time of testator's death than on March 1, 1913.

It seems to me that petitioner is right in her contention as to the basis of loss on these bonds and should be sustained on that point.

MARQUETTE, MATTHEWS, and LEECH agree with this dissent.

---

SEAWELL, dissenting: I dissent upon the grounds stated in my dissent to *William Huggett*, 24 B.T.A. 669, page 676, part of which is in agreement with the Circuit Court of Appeals on appeal of that case, 64 Fed. (2d) 705.